IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2006

**STATE OF TENNESSEE v. LEROY BRIMMER**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-05597     W. Mark Ward, Judge**

_____

**No. W2005-01932-CCA-R3-CD  - Filed May 4, 2006**

_____

A Shelby County Criminal Court jury convicted the appellant, Leroy Brimmer, of first degree premeditated murder, and the trial court sentenced him to life imprisonment. In this appeal, the appellant claims that the evidence is insufficient to support the conviction. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA McGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. J.C. McLIN, J., not participating.

Garland Erguden (on appeal) and Clifford Abeles and Amy Mayne (at trial), Memphis, Tennessee, for the appellant, Leroy Brimmer.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles Bell and Chris Scruggs, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On January 3, 2003, the appellant shot and killed his forty-one-year-old estranged girlfriend, Vicky Covin. At trial, Teresa Perkins, the victim's sister, testified that the victim graduated from nursing school and started a new job shortly before her death. Perkins and the victim had a close relationship, and the victim started dating the appellant in November 2000. Perkins and the appellant were friends and got along well. Perkins described the victim's and the appellant's relationship as "[u]p and down," and the couple would often break up and reconcile. In November 2002, the victim told Perkins that her relationship with the appellant was deteriorating. The victim denied that she was dating anyone else, but Perkins later learned the victim was dating Reginald Taylor. The victim asked the appellant to move out of her apartment. However, the appellant

refused, and the victim moved out. On December 23, 2002, the victim telephoned Perkins and told her that the appellant had reported to the police that the victim had abandoned her children. The victim was mad, returned to her apartment, picked up her children, and left. On Christmas day, the appellant came to Perkins' home for dinner. He told Perkins that the victim had "done him wrong," that the victim was "running around," and that he was going to have to kill her. Perkins was concerned, but the appellant assured her that he was "just talking." The appellant told Perkins, "I ain't going to do nothing like that," and Perkins did not believe the appellant was going to harm the victim. That night, the victim and the police went to the victim's and the appellant's apartment, and the police made the appellant leave. On cross-examination, Perkins testified that the appellant was upset that the victim had broken up with him. She said that although the appellant was usually fun and talkative, he was mad, irrational, and "talking crazy" on Christmas Day.

Deflora Clark, the victim's neighbor, testified that about 5:30 a.m. on January 3, 2003, she was watching television and heard arguing outside. She looked out the window, saw the victim, and heard the victim say, "Leroy, please let me go to work. If I don't go to work I'm going to lose my job." The victim got into her truck, and the appellant was standing near the truck's passenger side. Clark heard a gunshot, telephoned 911, and opened her apartment door. She saw the reverse lights on the victim's truck come on and heard two more gunshots. The victim's truck backed up and hit a tree and a fence. The appellant walked around to the front of the truck, put a gun in his jacket pocket, and calmly walked away. Clark and her boyfriend ran to the victim's truck, and Clark saw that the victim was slumped over and bloody. She heard a man in the victim's apartment yell that he was locked inside. Clark's boyfriend took the keys out of the truck's ignition and unlocked the victim's apartment door.

On cross-examination, Clark acknowledged that she told the police she did not recognize the person who shot the victim. However, she said that she was sure that the appellant was the gunman because the victim called him by name and because Clark saw him walk away from the victim's truck after the shooting. She said she got a clear look at the appellant and that he did not say anything to the victim before the shooting.

Reginald Taylor testified that he and the victim had been living together for two or three weeks at the time of the shooting. Taylor met the victim on Thanksgiving Day in 2002, and they became romantically involved two or three days later. On December 26, 2002, Taylor moved into the victim's apartment. On the morning of January 3, 2003, the victim got ready for work and left. Taylor heard a gunshot and heard the victim say, "Leroy, please let me go." Taylor started getting dressed, heard another gunshot, and tried to get out of the apartment by kicking the door. A neighbor unlocked the door and let Taylor out of the apartment. He said that while he and the victim were dating, the appellant would call his cellular telephone and threaten to kill him and the victim. He said that the appellant also harassed them and left threatening messages on his telephone's voice mail. On cross-examination, Taylor testified that he consumed alcohol the night before the shooting, but he denied drinking alcohol before testifying at the appellant's trial. He said that he never threatened the appellant, that he never saw the victim telephone the appellant, and that he did not hear the appellant say anything to the victim before the shooting. Just before the appellant shot the

victim, Taylor looked out a window and saw the appellant chase the victim around her truck. He acknowledged having three prior convictions for forgery.

Deputy Kimberly Trippett, who was assigned to the Fugitive Squad of the Sheriff's Office, testified that on the morning of January 3, 2003, the appellant came into the office, stated that he wanted to turn himself in, and stated that he had shot his girlfriend. Deputy Trippett patted down the appellant, and the appellant told her that he had left a weapon in his car. The Memphis Police Department was then notified of the crime.

Sergeant Eric Freeman of the Memphis Police Department testified that he collected evidence from the appellant's car on January 3. Sergeant Trippett found a .38 Special handgun on the front passenger seat. The gun contained three spent shells and three live rounds.

Officer Joe Stark of the Memphis Police Department testified that he and another officer interviewed the appellant on the day of the shooting. Officer Stark read the appellant his rights, and the appellant signed a waiver of rights form. The appellant wanted to talk to the police and was very responsive to the officers' questions. He did not appear to be under the influence of alcohol or drugs and gave a statement. In the statement, the appellant said the following: The appellant went to the victim's apartment in order to talk to her and get some answers. After he confronted the victim, he fired a warning shot into the air. The victim got into her truck and backed up the vehicle, and the appellant shot out the passenger side window. The appellant did not see any blood and fired the gun again. The appellant had not planned on shooting the victim but took the gun with him to the victim's apartment because he was afraid of the victim's new boyfriend and wanted to shoot him. Instead of shooting Reginald Taylor, the appellant shot the victim because she was mistreating him, was taking his money, and was spending his money on Taylor. In his statement, the appellant said that "the gun went off" and that the victim was responsible for her own death. On cross-examination, Officer Stark acknowledged that the appellant was very cooperative but upset. The appellant never told the officer that he had planned to kill the victim. Officer Stark said that the appellant was angry but that his anger appeared to be directed at the victim's boyfriend, not the victim. Officer Stark acknowledged that he may have asked the appellant if this was a heat-of-passion case.

Dr. O.C. Smith testified that he performed the victim's autopsy. The victim had two gunshot wounds, one to the right shoulder and one to the neck. The bullet which struck the shoulder traveled downward and to the left. It tore open the victim's axillary artery, which pushes blood into the arm. The bullet traveled into the victim's chest, damaged her right lung, fractured some ribs, and lodged in the skin on her back. As to the neck wound, the bullet entered the right side of the neck, where it damaged some muscles and hit some spinal bones. Dr. Smith classified the wound to the neck as a flesh wound. He said that he found no powder burns on the victim's body, indicating that the appellant fired the gun at least twenty-four inches away from the victim or that the bullets traveled through an intermediate source before they entered the victim. He said that the victim survived for about two hours after the shooting and that she died from blood loss and an inability to breathe.

Tomeka Davis testified for the appellant that she and the victim attended nursing school together and became friends. On Thanksgiving Day in 2002, the victim came to Davis' home, where she met Davis' brother-in-law, Reginald Taylor, for the first time. About one week later, the victim told Davis that she and Taylor had been seeing each other. On the night of December 25, 2002, the appellant telephoned Davis and told her that he was being forced to move out of his and the victim's apartment. At some point, Taylor moved in with the victim. Davis continued to have conversations with the appellant, and the appellant told Davis that the victim had been calling him and taunting him about their breakup.

David Brimmer, the appellant's brother, testified that the appellant was "head over heels" for the victim, that the couple was happy at beginning of their relationship, and that the appellant put the victim "above everything." Toward the end of 2002, David Brimmer learned the victim was having an affair. He said that he talked with the appellant and that the appellant was depressed and very upset. He said that the appellant's state of mind changed and that the appellant was confused. The appellant told Brimmer that he would not hurt the victim, and Brimmer was surprised about the shooting.

The appellant testified that he was the victim's fiancé, that they had been in a relationship for about five years, and that he paid for the victim to go to nursing school. While the victim was in school, the appellant paid their bills and bought clothes for the victim's two minor children, who lived with them. In December 2002, the victim's behavior changed, and the appellant learned she was having an affair. A few days before Christmas, the victim left the appellant and her children and would not return to their home. The appellant telephoned the police and told them to pick up the victim's children because he had to go to work. On the night of December 25, 2002, the victim had the appellant kicked out of their apartment. After that, the appellant was not himself. He said that the victim and Taylor telephoned him and were involved in sexual behavior over the telephone. The victim never told the appellant that their relationship was over, and the appellant tried to talk to her. However, the victim would not talk to him. On the night before the shooting, the appellant had a dream and woke up sweating. He drove to the victim's apartment, parked across the street, walked to the apartment, and waited for the victim to come outside. The appellant stated that he was wondering "who is this guy, you know, she done throwed up in my face."

The victim came outside and locked her apartment door. The appellant approached the victim and asked if he could talk to her. The victim began yelling and ran around her truck. The appellant asked the victim where Reginald Taylor was, and the victim told the appellant, "He ain't did nothing." The appellant said that his mind "just snapped," that he pulled out the gun, and that he started shooting. He said that he fired four shots and that he fired the first shot into the air. The victim got into her truck, and the appellant shot into the vehicle. He said that he always carried a gun on his person and that he was not trying to shoot the victim. He said that the victim knocked the truck out of gear, that the truck rolled backward, and that he did not know he had shot the victim. He walked away from scene and immediately drove to the police department. The appellant voluntarily confessed to police and told them that he thought he had shot his fiancé. The appellant testified that he shot the victim because he had gone into a rage, that he felt awful about the shooting,

and that he loved the victim.  On cross-examination, the appellant testified that he did not like the way the victim had treated him and that he was "deranged."  On the morning of the shooting, the appellant waited about fifteen minutes for the victim to come out of her apartment.  When he confronted her, she told him that Taylor had not done anything.  The appellant acknowledged that the victim's trying to protect Taylor angered him.  The jury convicted the appellant of first degree premeditated murder.

## II.  Analysis

The appellant claims that the evidence is insufficient to support the conviction, arguing that, at most, he is guilty of second degree murder or voluntary manslaughter.  In support of his argument, he notes that witnesses testified he was "confused" and "talking crazy" before the shooting and that he testified he "just snapped."  The State contends that the evidence is sufficient for a rational jury to conclude that the appellant premeditated killing the victim.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).  On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellant was convicted of premeditated first degree murder, which is defined as "the premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result."  Tenn. Code Ann. § 39-11-302(a).  Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

-5-

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

Viewed in the light most favorable to the State, the evidence establishes that the appellant and the victim had an "up and down" relationship and that the victim had the police remove the appellant from their apartment. Reginald Taylor immediately moved in with the victim, which angered the appellant. In the weeks before the shooting, the appellant told Teresa Perkins and Reginald Taylor that he was going to kill the victim. On the morning of January 3, 2003, the appellant drove to the victim's apartment, parked his car across the street, waited for the victim to come outside, confronted her, and fired a warning shot into the air. When the unarmed victim got into her truck and tried to flee from the appellant, he shot her twice. He then calmly walked away from the scene and drove to the sheriff's department. Although the appellant claimed at trial that he did not know he had shot the victim, Deputy Trippett testified that the appellant walked into the office and told her that he shot his girlfriend. At trial, the appellant admitted he was angry with the victim about their breakup and about her relationship with Taylor. We conclude that the evidence overwhelming supports the jury's finding that the appellant intentionally, and with premeditation, killed the victim.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-6-